**SEABOARD LUMBER COMPANY,
et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 610–84C, 632–84C, 677–84C, 33–85C, 85–85C, 95–85C, 423–85C, 664–85C, 37–86C, 38–86C, 135–86C, 364–86C, 442–86C, 553–86C, 780–86C, 64–87C, 363–87C, 285–87C, 435–87C, 561–87C, 589–87C, 681–87C, 750–87C, 800–87C, 28–88C, 54–88C, 68–88C, 69–88C, 70–88C and 71–88C.

United States Claims Court.

May 3, 1988.

William F. Lenihan, Seattle, Wash., for plaintiff. Mildred J. Carmack, of counsel.

Richard A. Smith, Fortuna, Cal., for plaintiffs in Nos. 677–84C, 85–85C, 135–86C.

Wesley R. Higbie, San Francisco, Cal., for plaintiff in No. 442–86C.

Jan D. Sokol, Portland, Or., for plaintiff in No. 423–85C.

John Spencer Stewart, Portland, Or., for third party, defendant United Pacific Ins. Co.

Paul J. Ehlenbach, Washington, D.C., with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, Director, and John W. Showalter, Asst. Director, for defendant, James P. Perry and Jeffrey K. Handy, Dept. of Agriculture, of counsel.

## OPINION

SMITH, Chief Judge.

These consolidated cases, through plaintiffs' motion to dismiss defendant's counterclaims, call into question the constitutionality of the Contract Disputes Act of 1978 (CDA)[1] as amended by the Federal Courts Improvement Act of 1982 (FCIA).[2] The main issue presented in plaintiffs' motion to dismiss is whether the Claims Court, an Article I tribunal, has jurisdiction to determine the defendant's counterclaims[3] which, according to plaintiffs, are common law breach of contract claims properly lodged only in an Article III tribunal. The plaintiffs' second and related issue is whether the Seventh Amendment to the Constitution requires a jury trial of the defendant's counterclaims. For the reasons stated below, we hold that the Claims Court has jurisdiction over the counterclaims and that the Seventh Amendment does not require that such counterclaims be tried before a jury.

### Facts

The facts are not complicated. The underlying contracts are timber sales contracts between various contractors and the United States Forest Service. Under each of the contracts in question, the plaintiffs were required to remove a certain amount of timber by a certain date. According to the government, the plaintiffs have each failed to meet the requirements of their respective contracts. Thus, the government has determined them to be in default and has sought to recover damages from the plaintiffs through a contracting officer's final decision adverse to them.

The majority of the contracts in question were executed after the March 1, 1979, effective date of the CDA, but before the October 1, 1982, effective date of the FCIA.[4] The contracts each include a disputes clause which in substance mirrors the requirements of the CDA. The disputes clause provides in part:

C9.2 (disputes).

(a) This contract is subject to the Contract Disputes Act of 1978 (Pub.L. 95–563).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved in accordance with this provision.

. . . .

(c) iii. . . . A claim by the government against the contractor shall be subject to a decision by the contracting officer.

. . . .

1. 41 U.S.C. §§ 601–13 (1982).

2. The Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25, replaced the Article III Court of Claims with the Article I Claims Court. The Court of Claims appellate Judges along with the Judges of the Court of Customs and Patent Appeals became the United States Court of Appeals for the Federal Circuit.

3. In *Alpine Veneers, Inc. v. United States,* Cl.Ct. No. 664–85C, the contracting officer has satisfied the damage claims by offset, thus, there is no jurisdictional dispute as plaintiffs are suing the United States under 28 U.S.C. § 1491 (1982) for a refund of money. *See Ingalls Shipbuilding v. United States,* 13 Cl.Ct. 757 (1987). In *Mt. Adams Veneer Co. v. United States,* Cl.Ct. No. 800–87C, the contract was awarded prior to the effective date of the CDA. In light of the court's holding that these cases do not require exclusive jurisdiction in the Article III judiciary, there is no merit to the argument that pre-CDA cases must be heard in the United States District Courts pursuant to 28 U.S.C. § 1345 (1982).

4. The contracts in *Alpine Veneers v. United States,* Cl.Ct. No. 681–87C; *Alpine Veneers v. United States,* Cl.Ct. No. 561–87C; *Brazier Forest v. United States,* Cl.Ct. No. 363–87C; and *Taylor Westbrook v. United States,* Cl.Ct. No. 422–86C were all executed after October 1, 1982. Therefore, even if these cases required an exercise of the Article III judicial power, the plaintiffs in those cases could be deemed to have waived any rights to Article III adjudication upon entering into the contracts in question.

(f) The contracting officer's decision shall be final unless the contractor appeals or files a suit as provided in the Act.

The CDA, incorporated into the contract by the disputes clause, currently provides that a contractor has two options when appealing a final decision of the contracting officer. The contractor may appeal within 90 days to the proper Board of Contract Appeals, 41 U.S.C. § 606 (1982), or within 12 months may file a direct access appeal in the United States Claims Court, 41 U.S.C. § 609(a)(3) (1982). However, at the time most of these contracts were entered into, the contractor had the option of a direct access appeal to the Article III Court of Claims rather than the Article I Claims Court.[5]

Plaintiffs have complied with the requirements of the CDA and are now appealing for trial *de novo* the contracting officer's decision that they are in breach of contract. In this court the United States pursues its breach of contract claims through counterclaims against the various plaintiffs.

## Discussion

### A. Does the Claims Court have the power to review the constitutionality of a statute granting jurisdiction?

■ A preliminary question raised by the plaintiffs in their reply brief is whether this court has the power to determine that the CDA, as amended by the FCIA, is unconstitutional as applied to the plaintiffs in this case. For support for the proposition that the court cannot question the constitutionality of statutes granting the court jurisdiction, plaintiffs cite *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), and cases cited in that opinion. While, as *Johnson* noted, an administrative agency generally does not have the juris-

diction to make decisions regarding the constitutionality of a statute, it is also true that this court cannot be construed to be an administrative agency. On this point the Court of Claims stated, after recognizing that the Supreme Court in *Williams v. United States*, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933) had a few years earlier ruled it to be a legislative court:

> [T]his court is a court, in fact as well as in name, and ... its decisions are judicial decisions. If it were not, the Supreme Court would not review its decisions, as it does, ... And we would suppose, unless the decision in the *Williams* case means to the contrary, that we are no more acting as a mere agent or arm of the legislature, when we decide our cases in the first instance, than is the Supreme Court, when it, under the appellate procedure prescribed in the statute decides them finally. Each court is assigned its place in the process of doing justice between the United States and those who have claims against it. That is the major portion of this court's assignment. It is only a small part of the Supreme Court's assignment. But one, when it is performing that assignment must be acting judicially, if the other is.

*Pope v. United States*, 53 F.Supp. 570, 100 Ct.Cl. 375, 383, *rev'd on other grounds*,[6] 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3 (1944) (footnotes omitted). Therefore, cases such as *Johnson* do not apply to an Article I court. Furthermore, this court has always exercised the power to determine its jurisdiction even when that consideration involved the constitutionality of a statute. *United States v. La Abra Silver Mine*, 29 Ct.Cl. 432 (1894) (opinion overruling defendant's demurrer on the question of jurisdiction) 32 Ct.Cl. 462 (1897) (the court's decision on the merits), *aff'd*, 175 U.S. 423,

---

5. Prior to the October 1, 1982, effective date of the FCIA, the CDA provided for direct access appeal to the Court of Claims. After October 1, 1982, the Court of Claims docket was transferred to the Claims Court and any further direct access appeals were filed in the Claims Court.

6. In *Pope* the Court of Claims held that a Special Act of Congress creating liability, but directing the court to calculate damages, was unconstitu-

tional because it encroached upon the judicial power of the court. The Supreme Court reversed, noting that the Court of Claims performed legislative, administrative, and judicial functions, but that the mathematical calculations involved required an exercise of judicial power and, therefore, the Court of Claims should have decided the case and the Supreme Court could review it.

20 S.Ct. 168, 44 L.Ed. 223 (1899); *Ingalls Shipbuilding v. United States,* 13 Cl.Ct. 757 (1987). Additionally, as noted in *Ingalls* "the Claims Court Judges take the same oath to exercise their duties consistently with the Constitution, which Chief Justice Marshall referred to in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 180, 2 L.Ed. 60 (1803)." *Ingalls,* 13 Cl.Ct. at 761. Thus, in order to comply with the oath, the court must fail to give effect to unconstitutional statutes and adjudicate only on those which it finds to be constitutional.

B. Do these cases require an exercise of the Article III judicial power of the United States?

1. *Federal contract law actions are not suits at common law.*

██ These cases present yet another chapter in the continuing saga of Justice Marshall's distinction between "legislative" and "constitutional" courts. *See American Ins. Co. v. Canter,* 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828). The basic issue involved is whether the government's breach of contract claims, brought as counterclaims pursuant to the CDA, are of such a nature as to require adjudication solely in a "constitutional" court established with full Article III protections of life tenure and irreducible salary. Deciding whether a claim is of that nature is not an easy task. However, there are certain cases which clearly fit within the sole jurisdiction of Article III. These cases are those traditional common law cases arising under state law and between private parties. *Thomas v. Union Carbide Agric. Prod. Co.,* 473 U.S. 568, 587, 105 S.Ct. 3325, 3336, 87 L.Ed.2d 409 (1985); *Northern Pipeline Co. v. Marathon Pipeline,* 458 U.S. 50, 90, 102 S.Ct. 2858, 2881, 73 L.Ed.2d 598 (1982) (Rehnquist J. concurring); *but see Commodity Futures Trading Comm. v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (The claims in *Commodity Futures* were state law claims, but there had been a waiver of any personal rights to Article III adjudication, and the statutory scheme did not violate the separation of powers doctrine). On the other hand, those cases which arise pursuant to rights created by federal statute or the federal Constitution may be susceptible to both Article III and Article I adjudication. *Thomas,* 473 U.S. at 584–85, 105 S.Ct. at 3334–35; *Northern Pipeline,* 458 U.S. at 80–81, 102 S.Ct. at 2876–77.

The claims in this case fall somewhere in the area between these two relatively bright lines. They do not present questions of state law within the understood holding of *Northern Pipeline* that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law...." *Thomas,* 473 U.S. at 584, 105 S.Ct. at 3334. Nor do they fall within those cases where Congress or the Constitution directly has created the applicable federal law from which the claims arise.

It is undisputed that the law to be applied in cases related to federal contracts is federal and not state law. *United States v. Allegheny County,* 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944); *Forman v. United States,* 767 F.2d 875, 879–80 (Fed.Cir.1985). The federal law applied in breach of contract claims is not, however, created by statute but rather for the most part has been developed by the Court of Appeals for the Federal Circuit and the Court of Claims, with the Claims Court, or the Boards of Contract Appeals applying the law in the first instance. This federal contract law also reflects the various contract clauses developed over time for the benefit of both the sovereign and the contractor through the practice of agencies and the bargaining leverage of contractors. It has drawn as well upon traditional private contract law for analogies and concepts. However, it is a separate and distinct body of law.

██ The court is of the opinion that disputes governed by this body of federal contract law do not constitutionally require an Article III tribunal. This is so because of the nature of the sovereign-contractor relationship. This relationship flows from

the Constitution [7] and is at the core of the most basic attribute of government: the ability to spend money and incur obligations. As noted in the Federalist 15:

> The great and radical vice in the construction of the existing Confederation is in the principle of LEGISLATION for STATES or GOVERNMENTS, in their CORPORATE or COLLECTIVE CAPACITIES, and as contradistinguished from the INDIVIDUALS of whom they consist. Though this principle does not run through all the powers delegated to the Union, yet it pervades and governs those on which the efficacy depends. Except as to the rule of apportionment, the United States have an indefinite discretion to make requisitions for men and money; but they have no authority to raise either by regulations extending to the individual citizens of America.[8]

When the sovereign enters into a contract, it does so as the sovereign, even though it has some attributes of a private contractual party. The federal sovereign is the guardian of certain national interests and values set forth in the Constitution. It must at all times act in this capacity, whether as contracting party, military force or keeper of the fisc. In *Ingalls Shipbuilding v. United States*, 13 Cl.Ct. 757 (1987), this court said:

> Government is not just a player in the legal and social marketplace, but it is the sovereign; the institution entrusted to act as the representative of the whole Nation and in the Nation's interest. The sovereign is the ultimate source of positive law and political legitimacy. It is the umpire and scorekeeper as well as a significant player in this market-place.

*Id.* at 761. Federal contract law, including the law of breach, has developed and changed over the years to reflect the particular concerns of the sovereign and its relationships with its contractors. As a result, federal contract law is not just a branch of the common law of contracts, but is a separate tree.

Suits by the sovereign in sovereign-contractor disputes are also not traditional suits at common law because federal contract law did not exist at common law. The term "common law" has long been synonymous with the law of England as it was during the time of the framing of the Constitution. *Robinson v. Campbell*, 16 U.S. (3 Wheat.) 212, 222–23, 4 L.Ed. 372 (1818); *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 8 L.Ed. 1055 (1834). Black's Law Dictionary defines the common law to be "that portion of the common law of England (including such acts of parliament as were applicable) which had been adopted and was in force here at the time of the revolution ..." Black's Law Dictionary 346 (4th Ed.1968) (quoting *Industrial Acceptance Corp. v. Webb*, 287 S.W. 657, 660 (Mo.App.1926)). It follows from the above that federal contract law is not synonymous with the common law of England, rather, the common law of England is that law adopted by the states and applicable in state law disputes between private parties, *Northern Pipeline*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), or in federal law disputes where there is no strong federal interest. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *De Sylva v. Ballentine*, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956); *Bank of America Nat. Trust & Savings Ass'n v. Parnell*, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956), *see also, Miree v. Dekalb Co.*, 433

---

**7.** U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States...."); U.S. Const. art. 1, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;"); U.S. Const. art. 1, § 8, cl. 18 ("Congress shall have the power ... to make all laws which shall be necessary and proper for carrying into execution the foregoing powers...."). *See also United States v. Allegheny Co.*, 322 U.S. 174, 182, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944); *Crowell v. Benson*, 285 U.S. 22, 51, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932).

**8.** The Federalist No. 15, at 108 (W. Kendall & G. Carey ed.) (emphasis in original).

U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977).[9]

The thought that common law is synonymous with state law was recently reflected by Chief Justice Rehnquist in *Northern Pipeline* where he said that state law contract actions are "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Northern Pipeline*, 458 U.S. at 90, 102 S.Ct. at 2881 (Rehnquist J. concurring); *see also Thomas*, 473 U.S. at 587, 105 S.Ct. at 3336.

Plaintiffs rely upon the fact that England sued its subjects for breach of contract in its courts upon writs of debt. This does not, however, support the plaintiffs' position. The states are the entities that adopted the common law of England, not the federal government. It was said early on that:

> [I]t is clear, there can be no common law of the United States. The federal government is composed of twenty-four sovereign and independent states; each of which may have its local usages, customs and common law. There is no principle which pervades the union and has the authority of law, that is not embodied in the constitution or laws of the union. The common law could be made a part of our federal system, only by legislative adoption.

*Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 658, 8 L.Ed. 1055 (1834). In *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) the Supreme Court reaffirmed this notion that there is no general federal common law. The court said "[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case [in federal court] is the law of the state...." *Id.* at 78, 58 S.Ct. at 822. *Erie* supports the conclusion that the federal contract law is different from the common law. Federal contract law is founded on the Constitutional powers of the federal government and not the law of the states.

At this point it is important to note that there are several definitions of common law, each based upon a particular purpose. The definition of common law as the law of England and of the states is applicable to Article III questions. The definition of common law as judge made law merely distinguishes that body of law from statutory and constitutional law, and in this sense there is a federal common law. *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (federal courts fashioning federal common law when the United States exercises a constitutional function and the applicable Act of Congress or constitutional provision does not cover the question involved). This federal common law though is not synonymous with the English common law; it is, rather, law created by the federal courts to fill in interstitially the federal constitutional and statutory law. In the area of federal contract law it does this, as well as interpreting contractual meaning.

Calling the claims involved in this case government breach of contract claims does not help plaintiffs' cause. The court's concern must be with the substance of these claims. *Commodity Futures Trading Comm. v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); *Thomas*, 473 U.S. at 587, 105 S.Ct. at 3336. The substance of these claims, as noted above, is not state law, or common law as the Framers understood it, nor are they breach of contract claims between private parties such as would fall solely within the Article III judicial power. Rather, they are claims created by the unique federally created sovereign-contractor relationship.

---

**9.** In *Clearfield Trust,* the Court held that federal law applied in cases involving the rights and duties of the United States on commercial paper issued by the United States. The United States had a strong interest in a uniform rule of law in the area of federal commercial paper. The *De Sylva* case involved the question of whether an illegitimate child was entitled to share in copyrights which came up for renewal during the widow's lifetime. The Court held that because there is no federal law of domestic relations, state law should be used to construe the word children as used in the Copyright Act. In *Parnell,* a diversity case between private parties which involved United States bonds, the Court held that because the only interests implicated were those of private parties, state law should apply.

Furthermore, to the extent that plaintiffs rely upon *Commodity Futures* that reliance is misplaced. In *Commodity Futures* the Court found that the claim was state law based but that there had been a waiver of any rights to Article III adjudication. The Court then went on to hold that there was no violation of the unwaivable structural concerns underlying the separation of powers doctrine. Here the court is of the opinion that this case does not call for an application of Article III judicial powers and so the court does not need to apply the *Commodity Futures* balancing test to the structural concerns, if any, implicated by these cases. In fact, *Commodity Futures* weakens the plaintiffs' argument since it holds that even if some common law elements are involved in a claim, an Article III forum may not always be mandated.

### 2. The "public rights" exception.

Several exceptions to required Article III adjudication were noted in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). There the Court specifically recognized four areas where the judicial power was not exclusively exercised by Article III judges; the territorial courts, where Congress' power to "make all needful rules and regulations respecting the territory" enabled it to require adjudication of typical Article III type cases in a legislative court; the District of Columbia courts, whose power was derived from Congress' control over the District; the Courts Martial, where the Constitution conferred upon Congress the power to make rules for the government and regulation of the land and naval forces; and the "public rights" exception first discussed in *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855). Of these, only the "public rights" exception is applicable in this case.

■ The court is of the opinion that the instant cases fall squarely within the "public rights" rationale and so, for this reason also, do not require an exercise of the judicial power reserved to the Article III courts. In an oft repeated quotation from *Murray's Lessee*, Justice Curtis laid out the beginning of the "public rights" doctrine:

> (We) do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

*Murray's Lessee*, 59 U.S. at 284.

In *Ex parte Bakelite Corp.*, 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929), the Court further explained the doctrine:

> Legislative courts also may be created as special tribunals to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it. The mode of determining matters of this class is completely within congressional control. Congress may reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals.

*Id.* at 451, 49 S.Ct. at 413 (footnote omitted).

And in *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), Chief Justice Hughes in distinguishing private versus public rights wrote "the distinction is at once apparent between cases of private rights and those which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Id.* at 50, 52 S.Ct. at 292. The Court went on to define private rights as "the liability of one individual to another under the law as defined." *Id.* at 51, 52 S.Ct. at 292.

It is clear that the government is a party to this litigation in its capacity as the sovereign. Although to a certain extent it is also true, as plaintiffs contend, that the United States does carry some attributes of a private party into litigation. For instance, the United States cannot resolve disputes by legislative or executive fiat; it must provide procedures, which it must follow, through which the rights of both parties are protected. *See Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935).

There is nothing in the concept that the United States acts like a private party in its claims against its contractors which mandates that the United States must sue in an Article III court. The concept merely requires that the United States not summarily declare a party in breach of contract. It requires proper procedures consistent with the mandates of due process. These procedures are met by initial placement of government breach of contract claims in the Claims Court or Boards of Contract Appeals with unified review in the Article III United States Court of Appeals for the Federal Circuit. *See Ingalls Shipbuilding Co. v. United States*, 13 Cl.Ct. 757 (1987).

These cases also involve a constitutional function of Congress as required by *Crowell*. Under Article I, section 8 of the Constitution, the legislature has delegated to the executive the power to "conduct the business of the people,"[10] by entering into contracts for the sale of United States property and the purchase of goods and services by the United States. No one can argue that Congress does not have the power to do so. *Allegheny County*, 322 U.S. at 182, 64 S.Ct. at 913. Therefore, this case arises between the government and a private party in connection with the constitutional functions of the executive and legislative branches.[11]

The Agriculture Board of Contract Appeals has reached the same conclusion on the identical issue. *See Gregory Timber Resources*, 87–3 BCA (CCH) ¶ 20,086 (Aug. 26, 1987), *appeal docketed*, No. 87–1598 (Fed.Cir. Sept. 2, 1987). In *Gregory Timber* the Board relied upon a line of Supreme Court cases holding that claims arising under federal contracts do not necessarily need Article III determination. *See United States v. Corliss Steam–Engine Co.*, 91 U.S. (1 Otto) 321, 23 L.Ed. 397 (1875); *United States v. Wunderlich*, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951); *United States v. Moorman*, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256 (1950). The Board concluded that matters arising under government contracts could be determined by non-Article III tribunals.

Reliance upon past cases where the government brought suit in the district courts under 28 U.S. § 1345 (1982) for breach of contract does not prove convincing. Because the sovereign could, prior to the CDA, and pursuant to congressional will, sue for breach of contract in the Article III courts as well as in the state courts, does not mean that jurisdiction must be lodged in those courts. *See Crowell*, 285 U.S. at 53, 52 S.Ct. at 293. The CDA, which does not create statutory breach of contract claims, but rather establishes direct access jurisdiction over government claims in the Claims Court, could have, like section 1345, provided for jurisdiction over government breach of contract claims to be placed in the District Courts. It, however, did not. The court believes these government claims are of the sort susceptible to both Article III and Article I adjudication.

The case of *United States v. Wilkins*, 19 U.S. (6 Wheat.) 135, 5 L.Ed. 225 (1821) cited by plaintiffs lends no further support to plaintiffs' position. Justice Story in that case said:

> [I]f there be no specific price agreed upon in the contract for rations issued at any place, the contract leaves the price to be adjusted by the government and the

---

**10.** Defendant's Response Brief at 18 (filed December 15, 1986).

**11.** In *Crowell* the court said "Familiar illustrations of administrative agencies created for the determination of such matters are found in connection with the congressional power as to interstate commerce, taxation, immigrations, the public lands, public health, the facilities of the post office, pensions and payments to veterans." 285 U.S. at 51, 52 S.Ct. at 292 (footnote omitted).

contractor. It is to be the joint act of both parties, and not the exclusive act of either. If they cannot agree, then a reasonable compensation is to be allowed, and that reasonable compensation is to be proved by competent evidence, and settled by a jury, as in common cases....

*Id.* at 142–43. It is clear that Justice Story was talking about factual findings by a jury in a District Court setting, a traditional function of the District Courts when acting as courts of law. There is nothing in his opinion declaring that government claims must be placed in the District Courts. This reading is consistent with the longstanding notion that if Congress places a federal cause of action in District Court, findings of fact are to be made by a jury.

The court's holding that jurisdiction over these government breach of contract claims is properly lodged in this court is consistent with Court of Claims and Federal Circuit precedent binding upon this court. In *Maryland Casualty Co. v. United States*, 135 Ct.Cl. 428, 141 F.Supp. 900 (1956), the Court of Claims held that it had jurisdiction over a purely government claim against a third party who had no claim against the government. Similarly, the Federal Circuit in *Rush v. United States*, 804 F.2d 645 (Fed.Cir.1986) upheld a government claim brought in this court against a third party with no claim against the government. In *Rush* the third party argued that the Claims Court could not exercise the Article III judicial power required to adjudicate the government's claims. The court upheld the government claims concluding that "this case involves public rights, i.e., a matter arising between the government and person subject to its authority in connection with the performance of the constitutional functions of the executive and legislative branch and which historically could have been determined exclusively by those branches." *Id.* at 647 (citations omitted).

C. Does the Seventh Amendment require a jury trial in these cases?

■ Plaintiffs argue that the Seventh Amendment provides them with a right to trial by jury. The Seventh Amendment provides: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." This argument has been made several times throughout the history of the Court of Claims and the Claims Court. *See McElrath v. United States*, 102 U.S. (12 Otto) 426, 26 L.Ed. 189 (1880); *Rush v. United States*, 804 F.2d 645 (Fed. Cir.1986). The cases have all held that the argument has no merit. In *McElrath* the Supreme Court found that government counterclaims were not suits at common law and that a jury trial in the Court of Claims was, therefore, not required. Similarly, the Federal Circuit in *Rush* summarily denied a third party defendant's argument that it was entitled to a jury trial. *Rush*, 804 F.2d at 647. Because this court holds that the government's breach of contract claims both involve "public rights" and are not suits at common law requiring an exercise of the Article III judicial power, it follows that a jury trial is not required.

*Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) does not require a different result. In *Tull*, Congress created, in favor of the government, a statutory civil penalty for violators of the Clean Water Act. The district court allowed the government to proceed without a jury and the court found the defendant liable under the Act. The Supreme Court held that in actions analogous to suits at common law, even when federally created, the Seventh Amendment requires liability to be determined by a jury. The difference between *Tull* and the present case is that in *Tull* Congress established a federal cause of action and placed it in a district court where provisions for a jury trial exist. If Congress puts a federally created cause of action analogous to an action at common law in the district courts then *Tull* requires a jury trial. However, this court does not read *Tull* to mean that where Congress properly puts a federal cause of action, an action involving "public rights," or an action otherwise not strictly within the judicial power, in an administrative agency or a legislative court, a jury trial is required. Such a reading would be incon-

sistent with prior Supreme Court decisions which *Tull* gave no hint of overruling. *See Atlas Roofing Co. v. Occupational Safety & Health Comm.,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Pernell v. Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974), *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921); *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

The plaintiffs' motion to dismiss the government counterclaims is denied. However, as these cases involve an interlocutory order, and a controlling question of law with respect to which there may be a substantial ground for difference of opinion, an immediate appeal from the order entered herein may materially advance the termination of this litigation. Accordingly, this opinion is certified for immediate appeal pursuant to 28 U.S.C. § 1292(d)(2) (1982), should plaintiffs seek such appeal.